USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/30/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

EDWARD MILLER,                           :
                                         :
                          Plaintiff,     :       **REPORT AND**
                                         :       **RECOMMENDATION**
              - against -                :
                                         :       **12 Civ. 3709 (GBD) (RLE)**
MICHAEL J. ASTRUE,                       :
**Commissioner of Social Security,**     :
                          Defendant.     :

———————————————————————

**To the HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

## I. INTRODUCTION

*Pro Se* Plaintiff Edward Miller ("Miller") commenced this action under the Social

Security Act (the "Act"), 42 U.S.C. § 405(g) and/or 42 U.S.C. § 1383(c)(3), challenging a final

decision of the Commissioner of Social Security (the "Commissioner") denying his claim for

disability benefits.  Miller asks the Court to modify the decision of the Commissioner and grant

him monthly maximum insurance and/or Supplemental Security Income ("SSI") benefits,

retroactive to the date of the initial disability, or in the alternative, to remand the case for

reconsideration of the evidence.  Miller argues that the decision of the Administrative Law Judge

("ALJ") was erroneous and not supported by substantial evidence.  On December 3, 2012, the

Commissioner moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure, asking the Court to affirm the Commissioner's decision and dismiss

the Complaint.  For the reasons that follow, I recommend that the Commissioner's motion be

**GRANTED** and the case be **DISMISSED.**

## II. BACKGROUND

### A. Procedural History

Miller applied for disability insurance benefits and social security income on June 20, 2008. (Transcript of Administrative Proceedings ("Tr.") at 48-51.) The application was denied on September 4, 2008, *id.* at 48, and on November 13, 2008, Miller requested a hearing before an ALJ. (*Id.* at 52.) Miller appeared before ALJ Kenneth G. Levin on March 26, 2010, *pro se*, waiving his right to legal representation. (*Id.* at 18-44.) The ALJ subsequently issued a decision on April 2, 2010, finding that Miller was not disabled under the Act and was not entitled to disability insurance benefits. (*Id.* at 8-17.) Miller requested review by the Appeals Council on April 13, 2010. (*Id.* at 5.) On March 7, 2012, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Miller's request for review. (*Id.* at 1-3.) Miller filed this action on May 9, 2012.

### B. The ALJ Hearing

#### 1. Testimony on behalf of Miller at the Hearing

Miller was born on March 20, 1977. (*See* Tr. at 22.) He is five feet, nine inches tall and weighs 170 pounds. (*Id.*) He earned a general equivalency diploma at age seventeen and attended paralegal school for about a year, but was a few credits short of receiving his certificate. (*Id.* at 23.) The last time he worked was in 2006, when he worked for the New York City Parks Department and earned about $8.00 per hour. (Tr. at 23.) Between July 2001 and June 2003, Miller had worked for New York City College as a radio announcer once a week. (*Id.* at 25.) Prior to that, Miller had worked in construction work from April to September of 1998, when he was laid off. (*Id.*) Miller had originally stated that he believed it was while working in construction that he received his "injury for the hernia," but later corrected himself by stating

that he actually did not get diagnosed with the hernia until about 2008, but had complained about it for several years before. (*Id.* at 26.) The ALJ concluded that Miller did not work long enough or earn enough money in any of his prior jobs to be considered as having performed "substantial gainful activity." (*Id.* at 27.) Therefore, the ALJ noted on the record that Miller would be considered to have no past relevant work, as the term is defined under 20 C.F.R. 416.960(b). (*Id.*)

Miller further testified that he has a cyst on his right testicle and also has pain in his right groin. (Tr. at 27.) Miller testified that he has had pain in his left groin for about eight years and that it has gotten worse. (*Id.*) He said he visited the emergency room a couple of times in 2006 and 2008 because "the pain was just so excruciating." (*Id.*)

Miller also stated that he has had a dull and aching pain in his chest for about five years. (*Id.* at 30.) He mentioned that this pain occurs when he lies down or when he does a lot of walking, especially when he visits his mother. (*Id.*) Miller stated that his mother lives several miles away, (*id.* at 36), and that she lives on the twenty-first floor of a building where the elevators were broken on an almost daily basis (*id.* at 31). He admitted to walking up and down all twenty-one flights everyday just the week before. (*Id.*) Miller reported that he could walk several blocks before he felt a stabbing pain. (*Id.*)

Miller is able to lift a bag of groceries, but said that he could not carry a heavy bag because of pain in his left wrist. (Tr. at 32.) He had an x-ray taken of his wrist in 2008, but no fractures or sprains were found. (*See id.* at 32, 177.) Miller is capable of cleaning and doing household chores. (*Id.* at 33.) While he is also able to cook, his mother often cooks for him when he goes to her house to help her with household chores or to do her shopping. (*Id.*) Miller testified that during an ordinary day he calls his doctors, reads, writes, and focuses on his pain. (*Id.* at 33-34.)

He exercises "a little," but it hurts when he tries to run. (*Id.*)  When he exercises, he does some chest curls and pushups. (*Id.*)  After about thirty pushups, he stops because he cannot "put as much pressure on his hand." (*Id.*)  Miller used to smoke marijuana about three or four times a week, but stopped because of his chest pain in early March 2010. (*Id.* at 36-37.)

### 2. Medical Evidence

#### a. Bronx-Lebanon Hospital Center Clinic

Miller was treated at Bronx-Lebanon Hospital Center Clinic from October 2007 through November 2008. (Tr. 136-92, 232-34, 242-43, 255-57.)  His earliest medical report on record is an ultrasound from October 5, 2007, which showed a right epididymal[1] head cyst, but no evidence of hydrocele[2] or varicocele.[3] (*Id.* at 242, 256.)  A scrotal ultrasound performed on January 22, 2008, was read as "most probably" indicating a small inguinal[4] hernia projecting into the left scrotal sac. (*Id.* at 255.)  Miller was subsequently seen by Dr. Veleazuella who had referred him to a surgeon because of a possible left inguinal hernia. (*See id.* at 207.)

On March 14, 2008, Miller was seen at the clinic by Dr. Ajay K. Shah, a surgeon, for complaints of left groin pain and discomfort. (Tr. at 143.)  Miller stated that he had had pain and discomfort in this area for about seven to eight years that "comes and goes," but that he did not experience any swelling or bulge in the groin area, nor any bowel or urinary issues. (*Id.* at 143.)

---

[1] Epididymal pertains to the epididymis which is the elongated cordlike structure along the posterior border of the testis; it provides for storage, transit, and maturation of spermatozoa. *Dorland's Illustrated Medical Dictionary*, 566 (28th ed. 1994).

[2] A hydrocele is a circumscribed collection of fluid, especially a collection of fluid in the tunica vaginalis of the testicle or along the spermatic cord. *Id.* at 783.

[3] Varicocele is a varicose condition of the veins of the pampiniform plexus, forming a swelling that feels like a "bag of worms," appearing bluish through the skin of the scrotum, and accompanied by a constant pulling, dragging, or dull pain in the scrotum. *Id.* at 1795.

[4] Inguinal pertains to the groin; the junctural region between the abdomen and thigh. *Id.* at 841.

4

Dr. Shah found "clinically no demonstrable hernia," and recommended another scrotal sonogram and a follow-up with a urologist. (*Id.* at 144.)

Miller was seen for a follow-up visit with Dr. Shah on July 29, and again complained of left testicular pain. (Tr. at 151.) Dr. Shah noted that Miller missed his urologist appointment because he was in jail for fighting. (*See id.* at 150-51.) Dr. Shah's examination showed that Miller's abdomen was soft and non-tender, with no masses. (*Id.*) The genitals were described as normal. (*Id.*) Dr. Shah's finding was again that there was no evidence of an inguinal hernia. (*Id.* at 152.) Miller was advised not to miss his next urologist appointment. (*Id.*)

At the clinic on August 6, Miller complained of heartburn that worsened when he ate greasy foods. (Tr. at 153.) A physical examination performed by Dr. Jenny Machuca, one of Miller's treating physicians at Bronx- Lebanon, revealed that Miller's extremities, respiratory system, and abdomen were normal. (*Id.* at 153-54.) Miller was advised by Dr. Machuca to stop smoking marijuana. (*Id.* at 154.)

Miller visited the emergency room at Bronx-Lebanon on August 15, with complaints of pain in his left groin. (Tr. at 160.) The clinical impression was reducible left inguinal hernia, and the attending physician, Dr. Ernesto Sy, recommended follow-up surgery for September 15. (*Id.* at 165.)

On August 20, Miller was seen by Dr. Jenny Machuca for a follow-up visit. (Tr. at 166.) Miller complained of right testicular pain. (*Id.*) A scrotal exam indicated "no erythema,[5] no swelling, non-tender to examination," but the doctor noted "palpable inguinal bilat[eral]-

---

[5] Erythema is defined as redness of the skin produced by congestion of the capillaries. *Dorland's Illustrated Medical Dictionary*, 576 (28th ed. 1994).

nontender" in her report, and advised Miller to take Tylenol for pain. (*Id.* at 166-67.) Dr.

Mahuca also recommended that Miller be evaluated for his low platelet count.

On August 26, Dr. Scheiber, a consulting physician at Bronx-Lebanon, tested Miller for

low platelet count and  noted that Miller had mild chronic idiopathic "thrombocytopenic

purpura" [6] which did not need specific treatment. (Tr. At 168.)

An ultrasound recommended by Dr. Shah was performed on September 5. (Tr. at 152.)

The sonogram ruled out any scrotal or testicular masses. (*Id.* at 173.)  Normal testicular flow

bilaterally, bilateral varicoceles, small hydroceles and microlithiasis[7] were all noted. (*Id.*)  On

September 8, Miller went to the emergency room at Bronx-Lebanon and complained of left wrist

and hand pain, but the x-ray revealed no evidence of fracture or dislocation. (*Id.*)  The attending

physician's clinical impression was a sprain or strain, and Miller was prescribed 800mg of

Motrin before being discharged. (*Id.* at 176.)

Miller returned for a follow-up visit with Dr. Shah on September 16.  Miller reported that

he did not have any "bulging" in his groin area. (Tr. at 182.)  Dr. Shah noted that Miller did not

want a re-examination.   The doctor reviewed Miller's prior examination records and sonogram

results from July 29- September 9, 2008. (*Id.*)  Dr. Shah's finding was "bilateral varicoceles,"

and "clinically no groin hernia." (*Id.*)  A follow up appointment with a urologist, Dr. Geisler,

was recommended.

On October 2, Miller had a CT scan on his brain because he complained of headaches. (Tr.

at 184.)  It is unclear which doctor recommended the CT scan.  The results of the CT scan were

---

[6] "Thrombocytopenic purpura" refers to the decrease in the number of blood platelets which can cause a small hemorrhage in the skin, mucous membrane, or serosal surface. *See id.* at 1707, 1390.

[7] Microlithiasis refers to the formation of minute concretions in an organ. *Id.* at 1038.

that there were "no significant focal intracranial lesions. . . in the posterior fossa or supratentorial

compartment," and that "mucosal opacity of left frontal sinus of chronic sinusitis" was noted.

(*Id.*)

A letter concerning Miller was sent from Dr. Geisler to his primary care physician, Dr.

Machuca, on November 6. (Tr. at 187, 234.) Dr. Geisler wrote that Miller complained of "left

groin pain, diffuse bilateral scrotal pain, and penile discharge intermittently since 2003." (*Id.*)

He explained that the scrotal sonogram performed in September 2008 showed no masses, but did

reveal "small varicoceles and hydroceles bilaterally. . . with [a] prominent right epididymal head

[cyst]." (*Id.*) A clinical exam had shown only insignificant scrotal changes. (*Id.*) Dr. Geisler

stated that Miller did not have a hernia. (*Id.*) He also wrote that Dr. Shah had also been

consulted, and that Dr. Shah had also concluded that no hernia was present. (*Id.*)

On November 6, Dr. Machuca noted that Miller returned to the clinic with the "same

complaints." (Tr. 188.) He also noted that Miller was very angry and used foul language when

describing his dissatisfaction with Dr. Geisler. (*Id.*) Dr. Machuca referred Miller to another

urologist, Dr. Rottenberg, and also recommended scrotal support. (*Id.*) Dr. Machuca prepared a

letter addressed "To Whom It May Concern" stating that Miller had a past medical history of

epididymitis and "current problems of bilateral varicoceles, hydroceles, [but] no testicular

masses." (Tr. at 190.) Additionally, Dr. Machuca stated that Miller had "persistent scrotal pain"

and was receiving care from his urologist, Dr. Geisler. (*Id.*)

### b. William Lathan, M.D.

Dr. William Lathan, a consulting physician at Industrial Medicine Associates in Bronx,

New York, examined Miller on August 9, 2008. (Tr. 133-35.) Miller stated that since February

2008 he had had pain in his right groin and pointed to his left inguinal area and complained of

pain that was often severe. (*Id.* at 133.) He did not describe any swelling in his groin or left scrotal area. (*Id.*) He also stated that he was able to perform all activities of personal care and daily living. (*Id.*) During a physical examination, Dr. Lathan observed that Miller was in no acute distress, had a normal gait and stance, and could walk on his heels and toes without any difficulty. (*Id.* at 134.) Miller was able to fully squat, rise from a chair without difficulty, and needed no assistance getting on and off the examination table. (*Id.*) Miller's abdomen was "soft [and] non-tender, [with] no hepatosplenomegaly[8] or masses." (*Id.*) His joints were "stable and non-tender," "straight leg raising was negative bilaterally" and he had a "full range of motion" and full "strength in the upper extremities." (*Id.* at 135.) Miller's chest and lungs had a "normal AP diameter" and a "normal diaphragmatic motion." (*Id.* at 134.) Dr. Lathan noted that his impression was "history of right inguinal hernia" and identified Miller's prognosis as "stable." (*Id.*) The doctor assessed that Miller had a "moderate restriction for bending, lifting, pushing, pulling, and strenuous exertion." (*Id.*)

### c. Montefiore Medical Group

Miller was treated at the Montefiore Medical Group from January 2009 through February 2010. (Tr. 193-229, 235-40, 243, 257.) Dr. Ijeoma Muo performed his physical examination on January 2, 2009. (*Id.* at 200.) Miller stated that he experienced a stabbing pain in his testicular area almost daily, lasting minutes to hours. (*Id.* at 197.) He complained of chest pain that occurred at least once a week, and admitted to smoking marijuana daily. (*Id.* at 199.) Miller said that his New Year's resolution, however, was to quit marijuana and other drugs. (*Id.*)

---

[8] "Hepatosplenomegaly" is used to describe the enlargement of the liver and spleen. *See Dorland's Illustrated Medical Dictionary* at 755.

Miller stated that he did chest press exercises and increased the amount in the last two weeks. (*Id.*) Dr. Muo's examination of the testes revealed "no direct or indirect inguinal hernia". (*Id.*)

Miller returned to Montefiore Medical on January 26, 2009, for a follow-up visit. (Tr. 205-06.) Dr. Muo noted Miller's history of small hydrocele, bilateral varicocele, and glaucoma, but mentioned that he had no chief complaint that day. (*Id.*) He stated that Miller had no deformities or swelling in his joints or hands, and referred him to hematology for mild pancytopenia[9]. (*Id.*)

Miller was seen by Dr. Bhupendra M. Tolia, a urologist, on February 10, for complaints of testicular pain. (Tr. 207-08.) Dr. Tolia stated that Miller was in no acute distress, his abdomen examination was unremarkable, and that there was no evidence of palpable visible hernia. (*Id.* at 207.) Examination of the scrotum revealed a questionable small bilateral varicocele, but it was not palpable and unlikely to cause pain. (*Id.*) The right epididymal cyst and left inguinal hernia were not palpable, and his testes and epididymis appeared to be normal, without any evidence of mass or tenderness. (*Id.*) Dr. Tolia explained to Miller that he agreed with Dr. Geisler that surgery on the varicocele may not relieve testicular pain, and that although he was not able to palpate the hernia, if Miller did have one, it is likely that it might be causing scrotal pain. (*Id.* at 208.) The doctor recommended that Miller be referred to another general surgeon for a second opinion. (*Id.*)

Miller returned to Montefiore Medical on March 23, complaining of testicular pain. (Tr. 210-11.) Dr. Muo performed a physical examination which revealed no testicular masses, no ulcers or exterior lesions, and no protrusion into the inguinal region. (*Id.* at 211.) Miller was

---

[9] "Pancytopenia" is the deficiency of all cellular elements of the blood. *See Dorland's Illustrated Medical Dictionary* at 1220.

9

seen again by Dr. Muo for a follow-up visit on April 30. (*Id.* at 214-15.) He complained of groin pain and persistent constipation. (*Id.*)   Miller also complained of sleep apnea, stating that he only slept five hours per night. (*Id.*)

Miller continued to complain of groin pain during his follow-up visits in July 2009. (Tr. 217-19.) On August 9, Dr. Thomas Aldrich diagnosed Miller with mild sleep apnea and stated that he had significant lower airways obstructive disease, and probably was asthmatic. (*Id.* at 221.) Miller was again seen by Dr. Muo on August 28, 2009, for a follow up visit. (*Id.* at 224-25.) Dr. Muo noted a "left testicular microlith"[10] with unclear significance, and a "tiny right spermatocele or epididymal cyst." (*Id.*)

A pelvic CT scan was performed in September 2009 which revealed "no evidence of an inguinal hernia on either side" of the testes and no bowel hernia. (Tr. 236.) There was evidence, however, of a small fatty hernia in the left periumbilical[11] region.

In October 2009, Miller was seen for follow-up of his CT scan and sonogram. (Tr. 237.) The physician stated that Miller had peptic ulcer disease, orchidalgia (pain in the testes), and likely represented pelvic pain syndrome. (*Id.*)   Miller was referred to general surgery for correction of left indirect hernia and was prescribed Neurontin. (*Id.*)

Miller was seen by Dr. Erin Goss for a pre-surgical appointment for inguinal hernia repair on February 26, 2010. (Tr. 238-39.) Dr. Goss stated that no hernia was palpated on examination. (*Id.* at 239.) The doctor also noted that inguinal hernia repair, it was a low risk procedure. (*Id.*)

---

[10] A "microlith" is a minute concretion or calculus. *See Dorland's Illustrated Medical Dictionary* at 1038.

[11] "Periumbilical" refers to the region around the navel. *See id.* at 1265.

10

### d. Richard J. Wagman, M.D.

Dr. Richard J. Wagman testified as a medical expert at the hearing. (Tr. at 38-41.) He testified that Miller's medical records have contradictory information as to whether or not he has a hernia. (*Id.* at 39.) Miller claims that he has been diagnosed with an inguinal hernia, but Dr. Wagman testified that with the exception of one or two ultrasounds in 2008 that showed a reducible[12] left inguinal hernia, all other medical records lack evidence of inguinal hernia. (*Id.* at 39-40.) Miller's primary care physicians, Dr. Shah and Dr. Machuca, have also agreed that he does not have a hernia. (*Id.* at 232-34.)

Dr. Wagman stated that hernias are easily correctable with surgery, and that if Miller did have a hernia, he would not be able to comfortably climb up and down twenty-one flights of stairs to visit his mother, as he testified to at his hearing. (*Id.* at 41.) Further, Dr. Wagman stated that an untreated hernia gets worse over time due to gravity, and that it would get larger and more obvious. (*Id.* at 41, 43.) He also testified that Miller's medical records show a bilateral varicocele in his testes, but that a varicocele is not a condition that would cause pain; generally, varicocele produce warmth in the testicle. (*Id.* at 39-40.) According to Dr. Wagman, Miller's electrocardiogram results were unremarkable and not significant. (*Id.* at 40.) After reviewing all medical records and observing Miller at the hearing, Dr. Wagman opined that Miller does not have a medically-determinable impairment that would reasonably be expected to interfere with his functioning, and especially not for a period of twelve months. (*Id.* at 41.)

---

[12] "Reducible" means that the hernia can be pushed back in. (Tr. at 39.)

11

### 3. The ALJ's Findings

On April 2, 2010, ALJ Kenneth G. Levin issued his decision that Miller was not disabled

within the meaning of § 1614(a)(3)(A) of the Social Security Act, (Tr. 11-17), and had not been

disabled since June 20, 2008, the date his application was filed. (*Id.* at 18.) The ALJ found that

Miller did not have an impairment or combination of impairments that had significantly limited

(or was expected to significantly limit) his ability to perform basic work-related activities for

twelve consecutive months. (*Id.* at 16.) The ALJ, therefore, found that Miller did not have a

"severe" impairment and his claim was denied at Step 2 of the Sequential Evaluation Process.

(*Id.*) Alternatively, Miller was found to have the residual functional capacity to perform the full

range of light work[13] and, according to the ALJ, Grid Rule 202.20[14] would direct a finding of

"not disabled" at Step 5 of the Sequential Evaluation Process. (*Id.*) The ALJ stated that there

was no medical or other credible evidence showing that Miller could not perform at least a full

range of light and sedentary work activities at the unskilled level. (*Id.*)

The ALJ found that "Miller looked perfectly well during the hearing, and he walked, stood,

and changed from sitting to standing with complete ease." (Tr. at 13.) The ALJ also found

Miller to be evasive in many of his answers, and noted that he would often precede each answer

---

[13] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Although the weight lifted may be very little, a job falls in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 416.967(b).

[14] Social Security uses "Grid Rules" to determine whether an applicant is disabled, and to what extent he or she is disabled. Each grid looks at age, education, and previous work. The ALJ found that Miller meets the qualifications under Grid 202.20, because he is considered a "younger individual," has the education of "high school graduate or more," and his previous work falls under "unskilled or none." Grid 202.20 directs a finding of "not disabled." *See* 20 C.F.R. § 416.945(a) (1999).

with "honestly," which, according to the ALJ, was almost as if Miller expected the ALJ to think
he was going to be dishonest. (*See id.* at 13.)

The ALJ found that although Miller's records confirm that he suffered a left wrist fracture
in September 2008, there was no indication that he still had swelling or any symptoms of his left
wrist or hand, with the exception of his statement to his doctor on July 24, 2009, that his wrist
felt stiff. (Tr. at 14.) Miller had also complained of chest pain on a few of his doctor visits, but
the ALJ noted that his doctors do not seem to feel that he has any clinically or functionally
significant heart disease. (*Id.*)

The ALJ found that Dr. Wagman's assessment of the evidence was the most convincing on
record. (Tr. at 15.) He credited Dr. Wagman's testimony that the information in Miller's
medical records concerning his chief complaint, groin pain and an inguinal hernia, is
contradictory as to whether Miller has a hernia. (*Id.*) The ALJ also credited Dr. Wagman's
testimony that if Miller had an inguinal hernia that had not been surgically corrected, it would
have enlarged and become more obvious. (*Id.*) Further, the ALJ stated that Dr. Wagman
confirmed his suspicions that if Miller had any functionally significant inguinal hernia (or other
pain-producing groin condition), he would not be able to climb twenty-one flights of stairs as
indicated in his testimony. (*Id.*) The ALJ found it not credible that a person with "excruciating"
pain every day could engage in such activity. (*Id.* at 15.) The ALJ also noted that Miller
testified to riding the subways for long periods of time, which can require significant standing
and stair climbing, and to doing thirty pushups during his exercise routine. (*Id.*) The ALJ
considered these activities inconsistent with Miller's testimony about "excruciating pain." (*Id.*)
Taking the evidence as a whole, the ALJ found that it was more likely than not that Miller did

not have a hernia or any other medical condition likely to produce pain or cause functional restrictions. (*Id.*)

Additionally, the ALJ found that Miller's resumé looked impressive, but that his actual work history was "extremely unimpressive," which undermined his claim that he was not currently working because of his medical problems. (Tr. at 15, 35.) Because Miller's resumé failed to demonstrate any actual work history, the ALJ found that he did not engage in any substantial gainful activity, and therefore had no past relevant work. (*Id.* at 16.) The ALJ found that, although Dr. Lathan concluded that Miller might be incapable of heavy and even medium activity, there was no credible evidence that he could not perform the full range of light and sedentary work. (*Id.*)

## C. Appeals Council Review

After the ALJ's decision on April 2, 2010, Miller requested review by the Appeals Council on April 13, 2010. (Tr. at 5-7.) Miller submitted additional evidence from the period of October 2007 to January 2010. (*Id.* at 241-58.) The evidence included two scrotal sonograms, and three fair hearing decisions for public assistance, which were held by the Office of Temporary and Disability Assistance in New York. (*Id.*) The Appeals Council denied Miller's request for review on March 7, 2010. (*Id.* at 1-4.)

## III. DISCUSSION

## A. Standard of Review

A court reviewing a denial of Social Security benefits does not review *de novo* the evidence in the record. *Pratts v. Charter*, 94 F.3d 34, 37 (2d Cir. 1996); *Jones v Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to determining whether the Commissioner applied the correct legal principles in making a decision and, if so, whether the

14

decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989); *Johnson v. Bowen*, 817 F.2d 983, 985; *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).  The substantial evidence standard applies to findings of fact as well as inferences and conclusions drawn from such facts. *Marrero v. Apfel*, 87 F. Supp. 2d 340, 345 (S.D.N.Y. 2000); *Smith v. Shalala*, 856 F. Supp. 118, 121 (E.D.N.Y. 1994).

If the Commissioner's decision that a claimant is not disabled is supported by substantial evidence in the record, the court must uphold the decision.  42 U.S.C. § 405(g); *Jones,* 949 F.2d at 59; *Arnone, at* 882 F.2d 34.  The court must uphold a denial of benefits supported by substantial evidence even where substantial evidence may also support the plaintiff's position, *Alston v. Sullivan*, 904 F.2d 122, 126 (2d. Cir. 1990), or where a reviewing court's independent conclusion based on the evidence may differ from the Commissioner's. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert denied*, 459 U.S. 1212 (1983); *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).  While the ALJ must set forth the essential considerations with sufficient specificity to enable the reviewing court to determine whether the decision is supported by substantial evidence, he need not "explicitly reconcile every conflicting shred of medical testimony." *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  A reviewing court gives deference to the ALJ's evaluation since he observed the claimant's demeanor and heard the testimony first-hand. *Pena v. Chater*, 968 F. Supp. 930, 938 (S.D.N.Y. 1997), aff'd sub nom. *Pena v. Apfel*, 141 F.3d

15

1152 (2d Cir. 1998) (citing *Mejias v. Social Security Administration*, 445 F. Supp. 741, 744

(S.D.N.Y.1978)).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Act, every individual who is considered to be "disabled" is entitled to disability

insurance benefits. 42 U.S.C. § 423(a)(1). The Act's definition of disability for the purposes of

disability insurance and SSI is substantially the same. *Hankerson v. Harris*, 636 F.2d 893, 895

n. 2 (2d Cir. 1980). A person is considered disabled when he or she is unable to engage in

substantial gainful activity by reason of any medically determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than

twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A); *Beauvoir v. Chater*, 104 F.3d

1432, 1433 (2d Cir. 1997). Establishing the mere presence of an impairment is not sufficient for

a finding of disability; the impairment must result in severe functional limitations that prevent

the claimant from engaging in any substantial gainful activity. 42 U.S.C. § 423(d)(2); *Rosa v.

Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). If a claimant is able to engage in his previous work

or other substantial gainful work, regardless of whether such work exists in the immediate area

in which he lives, whether a vacancy exists, or whether he would be hired for such work, he will

not be found disabled under the Act. *See* 42 U.S.C. §§ 423(d)(2)(A), and 1382c(a)(3)(B). For

the individual to be found disabled, both the medical condition and the inability to engage in

gainful activity must last for twelve months. *See Barnhart v. Walton*, 535 U.S. 212, 217-22

(2002).

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry: (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations; if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the residual functional capacity ("RFC") to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa*, 168 F.3d at 77; *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).

The Commissioner must assess the claimant's RFC to apply the fourth and fifth steps of the inquiry. A claimant's RFC represents the most that claimant can do despite his limitations. 20 C.F.R. § 416.945(a). The Commissioner must consider objective medical facts, diagnoses and medical opinions based on such facts, subjective evidence of claimant's symptoms, as well as the claimant's age, education, and work history. *Echevarria v. Apfel*, 46 F. Supp. 2d 282, 291 (S.D.N.Y. 1999); *Mongeur*, 722 F.2d at 1037 (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)); 20 C.F.R. § 404.1526(b). To properly evaluate a claimant's RFC, the ALJ must assess the claimant's exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(b), 404.1569(a). The ALJ is also required to evaluate the claimant's nonexertional limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b), 404.1569(a).

The claimant bears the burden as to the first four steps of the evaluation process, while the Commissioner has the burden of proving the fifth step. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). A claimant's own testimony regarding his daily activities often supports a finding that the claimant is capable of performing gainful activity. *See Pena*, 968 F. Supp. at

17

938.  If the claimant can establish that his severe impairment prevents him from returning to his previous work, the burden shifts to the Commissioner to demonstrate that the claimant retains the RFC to perform alternative substantial gainful activity which exists in the national economy. *Gonzalez*, 61 F. Supp. 2d at 29.  A finding of "not severe" should be made if the medical evidence establishes only a "slight abnormality" which would have no more than a minimal effect on an individual's ability to work.  *Rosado v. Astrue*, 713 F. Supp. 2d 347, 358 (S.D.N.Y. 2010).

Additionally, the claimant's statements regarding pain and other symptoms will be considered by the Commissioner, but these factors alone will not establish disability.  20 C.F.R. § 404.1529(a).  Medical findings must support the conclusion that the claimant suffers from an impairment which could "reasonably be expected to produce the pain or other symptoms alleged by the claimant, and which, when considered with all other evidence, would lead to the conclusion that the individual is under a disability.  *See* 20 C.F.R. §§ 404.1529, 416.929.  If claimant's symptoms suggest a greater impairment than can be shown by objective evidence alone, other factors should be considered.  *Echevarria*, 46 F. Supp. 2d at 292.  These factors include: (1) the person's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of medication taken by the individual to alleviate pain or symptoms; (5) treatment, other than medication, used to relieve pain; and (6) any other measures that the person uses or has used to relieve the pain or symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ may reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility.  *See* Soc. Sec. Rul. 96-7p, 61 Fed. Reg. 34, 483 (1996), 1996 WL 374186 (S.S.A.); *Aponte v.*

*Secretary, Department of Health and Human Services*, 728 F.2d 588, 591-92 (2d Cir.1984).

However, the ALJ must give reasons "with sufficient specificity to enable us to decide whether

the determination is supported by substantial evidence." *Echevarria*, 46 F. Supp. 2d at 292;

*Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984); *see Lugo v. Apfel*, 20 F. Supp. 2d 662,

663-64 (S.D.N.Y. 1998).

### 2. The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received.

*See* 20 C.F.R. § 404.1527(d); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).  The

treating physician's medical opinion as to the claimant's disability, even if retrospective, will

control if it is well-supported by medically acceptable techniques and is not inconsistent with

substantial evidence in the record.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Gonzalez*,

61 F. Supp. 2d at 29.  If the treating physician's opinion is not given controlling weight, the

Commissioner must nevertheless determine what weight to give it by considering: (1) the length,

nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion;

(3) the consistency of the opinion with the record as a whole; (4) the specialization of the

physician; and (5) any other relevant factors brought to the attention of the ALJ that support or

contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2)(i-ii); *Schisler*, 3 F.3d at 567-69.  The

Commissioner may rely on the opinions of other physicians, even non-examining ones, but the

same factors must be weighed as enumerated above.  20 C.F.R. § 416.927(f); *Wells v. Comm'r of

Soc. Sec.*, 338 F. App'x 64, 66 (2d Cir. 2009).  More weight must be given to a treating physician

than a non-treating one as well as to an examining source as opposed to a non-examining source.

20 C.F.R. §§ 404.1527(d)-(f), 416.927(d)-(f).

19

### 3. The ALJ properly reviewed and considered the evidence, and applied the correct legal principles.

#### a. The ALJ Properly Applied the Five-Step Sequential Analysis

The first task of the Court is to determine whether the Commissioner applied the correct legal principles in determining Miller's eligibility. *Rosa*, 168 F.3d at 77.  Miller asserts that the ALJ's decision "was erroneous, not supported by substantial evidence on the record, and/or contrary to the law." (Petitioner's Complaint ("Pet'r Compl.") at ¶ 9.)  The Commissioner maintains that the ALJ properly applied the correct legal principles in reaching his decision. (Defendant's Answer ("Def.'s Answer") at ¶ 9.)  The Court finds that the ALJ properly followed the requisite sequential analysis, and that Miller retained the residual functional capacity to work. (Tr. at 16.)

To reach his conclusion, the ALJ conducted the tests required by 20 C.F.R. §§ 404.1527, 416.920.  First, the ALJ found that Miller has not engaged in substantial gainful activity since June 20, 2008, the date of his application. (Tr. at 16.)  At the next step of the evaluation, the ALJ found that Miller did not have a medically determinable impairment that was "severe."  (*Id.*)  The ALJ found that Miller failed to meet his burden and that he did not have an impairment or combination of impairments which significantly limited, or would be expected to significantly limit, his ability to perform basic work-related activities for twelve consecutive months, and therefore he did not have a "severe" impairment.  (*Id.*); *Beauvoir*, 104 F.3d at 1433.  In the alternative, the ALJ found that if Miller were considered to have a severe impairment, he still had the residual functional capacity to perform the full range of light work, and Grid 202.20 would direct a finding of "not disabled" at Step 5 of the process.  (*Id.*)  The ALJ found that in either instance Miller was not disabled under the Act.  (*Id.*)

### b.  Substantial Evidence Exists to Support the ALJ's Determination

The ALJ reached his decision by observing Miller at the hearing and by examining the evidence, including medical records and expert testimony. (Tr. at 15.)  The ALJ stated that Miller's doctors have, at times, thought that he might have a left-sided inguinal hernia, but that most of the time his treating physicians at both Bronx Lebanon and Montefiore Hospital have concluded that he does not have a hernia. (*Id.*)  Miller has relied on an ultrasound performed in January 2008, which indicates that he "most probably" has an inguinal hernia, but several other radiographic tests and physical examinations performed at both hospitals failed to detect a hernia. (*See id.* at 14.)  Miller's medical records have sometimes shown that he has a cyst in his right testicle, as well as varicoceles and hydroceles, but Miller has not received a firm diagnosis. (*Id.*)  Because Miller's medical records are contradictory, the ALJ found that he has a "possible but unlikely inguinal hernia," which is a medically determinable impairment. (Tr. at 16.)  As there is no evidence that this impairment limited Miller's ability to perform basic work-related activities for twelve consecutive months, the ALJ properly concluded that Miller did not have a severe impairment. (*Id.*); 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1527.

The ALJ gave weight to the medical opinions and observations of Miller's treating physicians in the record. (Tr. at 15.)  Dr. Geisler, Dr. Shah, and Dr. Machuca, the physicians who treated Miller most frequently, all agreed that they were unable to detect an inguinal hernia. (*Id.* at 144, 152, 182, 233-34.)  Dr. Tolia, a urologist from Montefiore Medical, stated that he agreed with Miller's previous urologist, Dr. Geisler, that surgery on his bilateral varicocele may not relieve pain (because varicocele do not generally cause pain) and that he was unable to palpate a hernia. (*Id.* at 208.)  The result of Miller's most recent scrotal exam, performed by Dr. Erin Goss on February 26, 2010, was that no hernia was palpated. (*Id.* at 239.)

21

Additionally, the ALJ considered Miller's allegations of pain, and found that they were not entirely credible. (Tr. at 13-15.)  Because Miller's symptoms suggest a greater impairment than can be shown by objective evidence, the ALJ is entitled to consider his daily activities. *Echevarria*, 46 F. Supp. 2d at 292.  The ALJ stated that Miller "looked perfectly well during the hearing," and that he was able to change from sitting to standing and back with "complete ease." (*Id.* at 13.)  The ALJ also noted that Miller's activities were inconsistent with his claim of disability and "excruciating" pain. (*Id.* at 15.)  Miller admitted that he visited his mother on a daily basis where he often had to walk up and down twenty-one flights of stairs. (*Id.* at 14.) Further, Miller regularly rode the subways, which can often require significant standing and stair-climbing. (*Id.*)  Miller stated that he does not exercise as frequently anymore, but that when he does, he can do thirty push-ups and chest press exercises. (*Id.* at 35.)  At the hearing, Miller also admitted that he was able to do household chores, and could lift a bag of groceries. (*Id.*) Taking the evidence as a whole, the ALJ properly concluded that Miller did not have a severe impairment which would preclude him from performing light and sedentary work activities at the unskilled level. (*Id.* at 15.)

In determining whether Miller could do other work, the ALJ properly considered Miller's residual functional capacity and his vocational factors. (Tr. at 16.)  The ALJ found that the lack of medical evidence asserting that Miller was unable to perform light work, and the fact that Miller had more than a high school education and was only thirty-three years old, supported the conclusion that Grid Rule 202.20 would direct a finding that he is not disabled. (*Id.*)

Dr. Lathan's consultative examination on August 9, 2008, supports the ALJ's conclusion that Miller is not severely impaired. Dr. Lathan found that Miller had "moderate" limits on bending, lifting, pushing/pulling and strenuous exertion, but that he was in no acute distress, and

22

could squat and walk on his heels and toes without difficulty. (Tr. at 134.)  Although Miller may have moderate limits, his medical records fail to show that he would be significantly limited, which is required for a finding of severe disability. *Rosado*, 713 F. Supp. 2d at 358.

The ALJ evaluated Miller's medical records and testimony, and after observing his behavior and demeanor at the hearing, he found that Dr. Wagman's expert opinion best supported his own conclusions. (Tr. 14, 15.)  Dr. Wagman stated that if Miller did have a functionally significant inguinal hernia, he would not be able to climb twenty-one flights of stairs. (*Id.* at 41.)  Dr. Wagman also stated that if Miller did have an uncorrected hernia, it would have enlarged and became more obvious over time. (*Id.*)  When analyzing Miller's medical records, Dr. Wagman noted that there were contradictory medical opinions, and said that no one has come out and actually said whether Miller has a hernia, and that hernias are "surgically easily correctable." (*Id.*)

Miller's frequent activities, such as riding the subway for long periods of time, and running errands and shopping for his mother, are inconsistent with his claim that he is severely impaired. (*Id.* at 14-16.)  There is no medical evidence that Miller's possible inguinal hernia interfered with his ability to work, and the ALJ properly concluded that it is more likely than not that Miller does not have a hernia, or any other medical condition likely to produce pain or cause functional restrictions. (*Id.* at 15.)

Accordingly, the ALJ's decision that Miller is not eligible for SSI benefits was determined under the correct legal standard and supported by substantial evidence.

## C. CONCLUSION

For the reasons set forth above, I recommend that Defendant's motion be **GRANTED**, and that the Complaint be **DISMISSED.**

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 1310, and to the chambers of the undersigned, 500 Pearl Street, Room 725.  Failure to file timely objections shall consitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed.R.Civ.P. 72, 6(a), 6(d).

**DATED: August 30th, 2013**
**New York, New York**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge

24

Copies of this Report and Recommendation were sent to:

*Pro Se* Petitioner
Edward Miller
1512 Beach Avenue
Apt #15
Bronx, NY 10460
<u>Attorney for Respondent</u>
Susan D. Baird
Assistant U.S. Attorney
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007